Filed 8/2/22 In re N.T. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re N.T. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. C.T., Defendant and Appellant. | G061016 (Super. Ct. Nos. 15DP0056, 15DP0057, 15DP0058) O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Isabel Apkarian, Judge. Affirmed.

C.T., in pro. per., for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

C.T. (Mother) appeals from the juvenile court's order entered on January 5, 2022, following a postpermanency periodic review hearing concerning the placement of her three minor children: 16-year-old N.T., 15-year-old P.T., and 14-year-old D.L.[1] At the hearing, the court denied Mother's request that the children be returned to her immediately, but the court ordered Mother's visitation with the children be modified from supervised to unsupervised, a step forward toward the children's potential return. Mother's overall contention is the court erred by failing to order the minors be returned to her custody. She also presents the following four arguments: (1) the Orange County Social Services Agency (the Agency) had not complied with the court's orders concerning her visitation with the children; (2) the court should have ordered sibling visits to occur regularly; (3) the Agency's request for Mother to again complete reunification services violated Mother's constitutional rights to remain silent; and (4) the court erred by not addressing noncompliance with the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) (ICWA). We discern no error in the juvenile court's order and affirm.

FACTS

I. *Background*

This is not Mother's first appeal from proceedings in the juvenile court that began when the Agency filed a dependency petition in 2015, alleging she posed a substantial risk to the physical and emotional well-being of her then five minor children.[2] Mother previously appealed following the 18-month permanency review hearing in

---

[1] As the children's father did not appeal from the court's order, he is not a party in this appeal.

[2] Two of Mother's children have since reached the age of majority and are no longer within the juvenile court's jurisdiction.

December 2017.  There, the juvenile court had declined to return the children to Mother's custody and, instead, had ordered long-term foster care as the permanent plan for the children.  In that appeal, Mother challenged the court's finding that returning the children to her care posed a substantial risk of detriment to their physical or emotional well-being.  We affirmed the court's order, finding it supported by substantial evidence.  (*In re C.W. et al.* (July 30, 2018, G055742) [nonpub. opn.].)  The facts leading to dependency and the family's progress through the 18-month review are included in our prior opinion, and we will not repeat them here except to the extent necessary to this appeal.[3]  Since their removal from Mother's custody in December 2015, N.T. and P.T. have been in eight different placements, while D.L. has been in nine.

II. *Postpermanency Review for July 2021 through December 2021*

Here, Mother is appealing from the postpermanency review hearing held in January 2022.  Postpermanency review hearings are held every six months when children remain in long-term foster care.  (Welf. & Inst. Code, § 366.3, subd. (d)(1).)[4]  The period under review at this hearing was from July 2021 through December 2021.

During the period under review, N.T. and P.T. were removed from an out-of-county foster home, where they were living together, and placed out-of-county with a nonrelated extended family member (NREFM).  Both children reported they were happy with their new placement.  D.L., however, remained in a short term residential therapeutic program, a group home, where he had been since at least February 2021. The Agency was seeking a less restrictive placement for D.L. but his behavioral issues made

[3]     The current appeal is Mother's fifth.  In an order dated January 31, 2022, we incorporated by reference the clerk's transcript in Mother's fourth appeal (case no. G060458) into this appeal.

[4]     Subsequent statutory references are to the Welfare and Institutions Code unless otherwise stated.

placement difficult. The Agency was unable to place all three children together because of their different level of needs and the unavailability of a foster home to accommodate them.

Prior to the January 2022 postpermanency review hearing, the Agency filed its "Status Review Report" (report). The Agency recommended the children continue to be dependent children of the court and the previously existing orders remain in full force and effect. The Agency also recommended the court find the children's placements were appropriate, the permanent plan for the children continued to be appropriate, the services provided the children were adequate, and there had been substantial compliance with the permanent plan for the children. The permanent plan for P.T. and D.L. was foster care placement with a fit and willing relative, and the permanent plan for N.T., given his age, was another planned permanent living arrangement. The Agency indicated in its report that during the period of supervision, the children had struggles with their academics, behaviors, placement, and visitation with Mother.

Regarding visitation, the report indicated Mother was authorized to have six hours of monitored visitation per week with the children. During the first half of the review period, due to the pandemic and at Mother's request, visitation was done by video for three hours a week. Mother had video visits and unsupervised phone calls with the children. Visitation, however, transitioned to in-person visits during the review period. Mother wanted visitation at certain locations near her due to her lack of transportation. The social worker arranged for Mother to have monitored visits with the children at locations of Mother's choosing; the visits were two days a week, for three hours each. D.L. consistently attended in-person visitation with Mother. N.T. and P.T.'s visitation with Mother and D.L. was not as consistent. N.T. and P.T. cancelled or refused visitation with Mother multiple times; Mother cancelled her visitation with the children once. Mother cancelled her visitation another time when N.T. and P.T. were enroute but running late. All three children declined visitation with Mother one date in December.

4

The Agency contacted Mother concerning potential make-up visits, but Mother declined them, stating she would wait to hear from the court. A social worker who observed some of the visits noted Mother properly engaged with her children, appeared supportive, and calmly communicated with them. She recommended Mother's visits be unsupervised.

All three children struggled academically, especially with distance learning during the pandemic. N.T. was in the 11th grade and at risk of not graduating due to missing credits from the beginning of high school. His school counselor indicated N.T. made a huge turnaround in the second semester of his sophomore year and had continued to make an educational comeback. Although N.T. was initially resistant to tutoring, he had agreed to having a tutor help him in his upcoming semester. N.T. had numerous unexcused absences for zero period, which was before school starts, and seventh period, which was after school and was a credit recovery course.

P.T. was in the ninth grade. He had missed a number of assignments and as a result was failing several classes. He, too, agreed to a tutor for the upcoming spring semester after repeatedly refusing one in the past.

D.L. frequently refused to go to school, where he was in the eighth grade, and he struggled when he did go. Mother, who held education rights, was resistant to D.L. obtaining extra support at school to address his Autism and Attention Deficit Disorder. The Agency recommended she request a student success team meeting and/or an individualized education program evaluation for D.L., but she refused because an evaluation had already been completed for D.L. His last educational assessment was conducted in May 2020, and he was assessed at a third grade level. D.L.'s attendance had recently improved but he had multiple missing assignments in various classes.

D.L. also had difficulties at his placement with his behaviors and interactions. He exhibited physically and verbally aggressive behaviors and issues with self-hygiene. At the group home, he failed to follow the rules, called staff names, was very angry, threatened to hurt a child, and bullied another child. When talking to his

social worker, D.L. admitted to behaving poorly in the group home, explaining he did not like being told what to do. In December 2021, he got into a verbal argument with a resident in the home and pushed the resident into the wall; the resident requested the police be called. D.L. was receiving mental health services and was working with his therapist.

At the group home, D.L. was injured while horseplaying with another minor. He was taken to the hospital at Mother's request, but he refused to wait to be seen. Days later he was again taken to the emergency room and seen by a doctor.

During the review period, Mother raised multiple concerns with the Agency concerning the children's well-being, safety, schooling, behaviors, and placement. In December 2021, she filed a request with the court that the Agency be ordered to review N.T. and P.T.'s placement with the NREFM. Mother indicated that after the children had been placed with the NREFM, N.T. was suspended from school for five days for damaging and stealing school property. Mother was also concerned about some of N.T.'s social media posts and believed there was a possibility of gang activity. She stated she had asked the Agency to remove N.T. and P.T. from their placement. Mother requested the court order the children be returned to her home so she could provide them adequate educational and emotional support.

Prior to the postpermanency review hearing, the children's social worker talked to them about unsupervised visitation with Mother and returning home to live with her. All three wanted unsupervised visitation with Mother. As for returning to live with her, P.T. felt Mother would be able to keep him safe. However, he was concerned N.T. and D.L. would not do well in the home with Mother because they are "'hard headed'" and Mother would not be able to handle them. N.T. was agreeable to returning home with Mother. D.L. stated he had more freedom at his current placement and thought living with Mother would be "'Weird.'" He indicated he wanted to go live with Mother if his siblings did. He felt Mother had made improvements and would be safe. All three

children reported they did not want to be adopted and instead wanted to live with Mother and their siblings.

The Agency, however, had concerns about returning the children to Mother's custody. One of these concerns was Mother's failure to accept responsibility for her conduct that led to the initiation of the dependency proceedings. Mother previously had completed some services but continued to deny abusing the children. The Agency had recommended Mother re-enroll in therapy and parenting classes as a starting point to determine if the children's return to her care was possible. Mother was unwilling to re-enroll in a parenting class, responding she had completed it years ago, and she did not re-enroll in therapy. Another reason the Agency was concerned was Mother's resistance to the advice and guidance provided by the children's care teams. The Agency remained unconvinced Mother could safely care for the children if they were returned to her care and concerned the children would not have the resources they needed to be successful.

## III. *Postpermanency Review Hearing*

The juvenile court held the section 366.3 postpermanent plan review hearing on January 5, 2022, at which the Agency's report was admitted into evidence. Mother requested the children be immediately returned to her care "within reason." The Agency expressed its concerns with returning the children to Mother's care but indicated it was willing to assess and recommend return if Mother participated in some services. Counsel for the children did not believe it was in the children's best interest to immediately return them to Mother's custody. Children's counsel asserted Mother needed to show more cooperation with the Agency and take further reunification steps before the children were returned. The court noted Mother had demonstrated complete commitment to following up with the case. However, the court concluded based on the evidence, the children should not be immediately returned to Mother's care and custody.

The court found continued supervision was necessary for all three children. The court continued the permanency plan of foster care placement with a fit, willing relative for P.T. and D.L. and another planned permanent living arrangement for N.T. Over the Agency's objection, the court ordered Mother to be given six hours of unsupervised visits per week with the children. The court indicated it would look at the result of those visits in determining whether return was appropriate in the future. The matter was continued six months for the next periodic review hearing.

## DISCUSSION

Unfortunately, we must begin by reiterating general principles of appellate law and certain appellate rules of court. We are compelled to do so because Mother's briefing falls short of appellate standards and County Counsel requests Mother's claims be deemed forfeited because of these deficiencies.

"The most fundamental principle of appellate review is that "'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it . . . and error must be affirmatively shown.'" [Citation.]" (*Universal Home Improvement, Inc. v. Robertson* (2020) 51 Cal.App.5th 116, 125.) The burden to establish error is firmly placed on the appellant, in this case, Mother. (*Ibid.*; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) "To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error. [Citations.] When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' [Citations.] Hence, conclusory claims of error will fail." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Claims of error will also fail if the appellant neglects to support an argument with any citations to the record. If a party fails to do so, the argument may be stricken and

8

"deemed to have been waived." (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856; see also Cal. Rules of Court, rule 8.204(a)(1)(C).)

These are basic appellate principles and apply to Mother as a self-represented appellant. (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 523.) We recognize Mother made an effort to comply with some of the appellate rules, but her efforts fall short. In the "Argument" section of her opening brief, Mother presents four claims under separate headings in compliance with California Rules of Court, rule 8.204(a)(1)(B). However, all four claims are conclusory as they do not contain meaningful legal analysis. (*In re S.C., supra*, 138 Cal.App.4th at p. 408.) In all four, Mother does not provide citations to facts in the record to support her arguments, and in three of her claims, she cites no legal authority in support. Two of her claims consist of one sentence. As County Counsel notes, Mother's brief further runs afoul of appellate rules as it fails to present a balanced summary of significant facts in the record (Cal. Rules of Court, rule 8.204(a)(2)(C)), contains few record citations in its statement of facts (*id.* at rule 8.204(a)(1)(C)), and refers to an unpublished opinion in violation of California Rules of Court, rule 8.1115(a).[5]

The rules of appellate procedure are not in place to trip-up self-represented litigants and deny them an appeal. Their purposes are to help a reviewing court understand the argument being made and the factual and legal support for it so that the court may give due consideration to the issue. County Counsel asserts Mother's brief does "not present a fully articulated legal basis for her apparent requested relief." We agree. Mother's failure to adhere to established appellate principles makes it difficult for

---

[5] In her reply brief, Mother defends her citation of an unpublished decision by referring to rule 32.1 of the Federal Rules of Appellate Procedure, which allows the citation of unpublished federal opinions issued after January 1, 2007. However, California's Rules of Court apply in this appeal and rule 8.1115(a) prohibits reliance on unpublished California opinions.

us to decipher her exact claims of error. Nevertheless, to the extent we are able to do so, we will address Mother's claims on their merits.

I. *Failure to Return the Children to Mother's Custody*

We begin with Mother's overarching contention the juvenile court should have ordered the children be returned to her custody immediately. The Agency responds the juvenile court properly declined Mother's request for immediate reunification. We agree with the Agency.

For years now, this case has been in the postpermanency phase under section 366.3. "Section 366.3 generally governs periodic reviews (which must be scheduled every six months) in cases where the child has been placed in long-term foster care . . . while dependency jurisdiction is continued. [Citations.]" (*D.T. v. Superior Court* (2015) 241 Cal.App.4th 1017, 1040.) The purpose of the section 366.3 review hearing is to ensure continuous efforts are made to find a more permanent placement for children in long-term foster care. (*M.T. v. Superior Court* (2009) 178 Cal.App.4th 1170, 1178.) At the review hearing, the court must "inquire about the progress being made to provide a permanent home for the child [and] shall consider the safety of the child." (§ 366.3, subd. (e).) Subdivision (e) of section 366.3 specifies numerous findings the court must make at the hearing, the first of which is "[t]he continuing necessity for, and appropriateness of," the children's placement. (§ 366.3, subd. (e)(1).) The court must also determine, as relevant here: whether the child's permanent plan is still appropriate (*id.* at subd. (e)(3)); the parents' progress "toward alleviating or mitigating the causes necessitating placement in foster care" (*id.* at subd. (e)(7)); "[t]he likely date by which the child may be returned to, and safely maintained in, the home, . . . [or] placed with a fit and willing relative, . . ." (*id.* at subd. (e)(8)); and "[t]he frequency and nature of the visits between the siblings" if they are not placed together (*id.* at subd. (e)(9)(A)(iv)(I)).

10

At the review hearing, the court must consider all permanency planning options for the children, including whether they should be returned to the home of a parent, placed for adoption, appointed a legal guardian, or placed with a fit and willing relative. (§ 366.3, subd. (h)(1).) At this stage, however, there is "a statutory presumption in favor of continued out-of-home placement rather than efforts to return the child home." (*In re C.W.* (2019) 33 Cal.App.5th 835, 840-841.) "Continued foster care is presumed to be in the child's best interests unless the parent proves by a preponderance of the evidence that further efforts at reunification are the best alternative for the child. ([§ 366.3, subd. (f)].)" (*In re J.F.* (2011) 196 Cal.App.4th 321, 330.) "'By placing the burden of proof on the parent and focusing exclusively on the child's best interests, section 366.3, subdivision (f) promotes the welfare of the child and avoids interference with permanency planning, while leaving open the possibility of reunification in those rare cases where it might remain the child's best option.' [Citation.]" (*In re C.W., supra*, 33 Cal.App.5th at p. 841.)

The juvenile court's order following a section 366.3 hearing, like other custody placement orders, will not be disturbed on appeal absent a clear abuse of discretion. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 415 [ruling on § 388 petition to change order after permanency planning hearing reviewed for abuse of discretion; *Alicia B. v. Superior Court* (2004) 116 Cal.App.4th 856, 862-863 [placement order under § 361.3 reviewed under abuse of discretion standard].) We "'interfere only "'if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did.' [Citations.]" [Citation.]' [Citation.]" (*Alicia B. v. Superior Court, supra*, 116 Cal.App.4th at p. 863.)

The juvenile court's decision to deny immediate reunification was well within the court's discretion. Until Mother addresses the issues that lead to the children's dependency, it is not in their best interest to be returned to her. Mother still has not admitted culpability for the children's injuries, which lead to the initiation of these

11

dependency proceedings. Even now, more than six years later, she maintains the allegations of abuse were false. By failing to take responsibility for her actions, Mother cannot move forward. Although additional services have been recommended, she refuses to engage in them and therefore has failed to gain the skills she needs to ensure the children's safety in her custody. The court reasonably could conclude Mother needed additional services to address the problems that led to the children's dependency and that it was not in the children's best interest to return them to her custody.

The juvenile court, nevertheless, left open the possibility the children would be returned to Mother in the future, granting her unsupervised visits as a step in this direction. If Mother takes the additional steps requested by the Agency, there remains the possibility the children will be returned to her.

II. *Visitation*

Mother's first two arguments concern visitation. She contends the Agency was not complying with the court's prior orders regarding her visitation with the children and the court should have ordered sibling visits to occur regularly. Neither argument is supported by citation to pertinent facts in the record or a substantive legal argument and is therefore waived. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) Even considering the contentions on their merits, we perceive no error.

We first consider Mother's contention the children's visits with her were not in compliance with the juvenile court's orders. The juvenile court previously had authorized Mother to have six hours monitored visitation with the children weekly. According to the Agency's report, during the first half of the review period, at her request and due to the pandemic, Mother had video visits with the children three days a week. When visitation transitioned to in-person visits, difficulties arose on some occasions in getting N.T. and P.T. to the location Mother selected for visitation with all three children.

12

Mother's visitation with N.T. and P.T. was complicated by the children's out-of-county placement and Mother's insistence the visits take place at certain locations near her. Mother was not amenable to travel to locations closer to N.T. and P.T.'s placement for visitation, thus forcing the children to endure lengthy travel time twice a week, once on a school night and the other on Saturday. Multiple visits were cancelled because N.T. and P.T. refused visitation. Mother cancelled her visits with the children twice. The Agency noted in its report that Mother was owed seven hours of visitation with D.L. and 19 hours with N.T. and P.T. When the Agency contacted Mother about possible make-up visits during the children's winter school break, Mother declined make-up visits until she heard from the juvenile court. The Agency's report indicated Mother also had unsupervised phone calls with the children in addition to video and in-person visitation.

At the postpermanency hearing, the court found the Agency had made reasonable efforts to maintain the children's relationships with individuals who are important to them and in their best interests. (§ 366.3, subd. (e)(3).) Mother was an important person to the children and providing regular visitation was important to maintaining her relationship with the children. (*In re Ethan J.* (2015) 236 Cal.App.4th 654, 660.) We conclude substantial evidence supported the court's finding the Agency had made reasonable efforts to maintain the children's relationship with Mother. The Agency worked with Mother to provide regular visitation. The Agency found locations for visitation that were agreeable to Mother and coordinated the visits based on the children's and Mother's schedules. To address the missed visits, the Agency offered Mother make-up visits, but she declined them. We see no error.

Nor do we find persuasive Mother's assertion the court should have ordered sibling visits to occur rather than delegating authority to the Agency to determine the frequency and duration of these visits. Mother contends the court should have ordered sibling visitation because "sibling visits were not occurring regularly." Her contention is

13

not supported by the record.  N.T. and P.T. were placed together and they saw D.L. at their twice weekly visits with Mother.  The children saw their older brother when he accompanied Mother on her visits.  The siblings also remained in contact by playing online video games together.  No new orders concerning sibling visitation were needed.

III. *Agency's Request Mother Complete Reunification Services Again*

Mother's third argument is difficult to decipher as it lacks legal analysis, legal authority, or citation to the record.  For these reasons, we could deem it waived and pass it without further consideration.  (*In re S.C., supra*, 138 Cal.App.4th at p. 408.)

We will, nevertheless, address what we believe Mother's contention to be. Mother asserts the Agency's request she complete reunification services again violates the Fifth Amendment to the United States Constitution and Article I, section 15 of the California Constitution.  We disagree.

Mother completed some reunification services in 2018, but the Agency has continued to encourage her to complete additional services.  The Agency has done so because it has concerns Mother has not taken responsibility for her conduct that led to the initiation of the dependency proceedings and therefore she has not made significant progress in addressing it.

Requesting Mother complete additional reunification services does not implicate her right to remain silent under either the federal or state Constitutions. Juvenile dependency proceedings are civil in nature, not criminal.  Under section 355.1, subdivision (f), "[t]estimony by a parent . . . who has the care or custody of the minor made the subject of a proceeding under Section 300 shall not be admissible as evidence in any other action or proceeding."  Given the immunity provided to a parent in dependency proceedings, an "order requiring participation in therapy does not infringe a parent's right against compelled self-incrimination."  (*In re D.C.* (2015) 243 Cal.App.4th

14

41, 57, superseded by statute on other grounds as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322.)  Accordingly, Mother's claim fails.

## IV. *ICWA*

Mother's fourth argument is that the juvenile court erred by "not addressing ICWA non-compliance issues." (Boldface and capitalization omitted.)  Mother asserts in 2016 and 2020 she provided information to the Agency regarding the children's tribe membership status but the record "continues to reflect inaccurate information regarding the children's membership status, notice requirements and proper identification."  This is the extent of Mother's argument.  She does not provide any citation to the record to support her claim.  Thus, we do not know what information she provided to the Agency nor what part of the record she contends is inaccurate.  A reviewing court will not perform an independent, unassisted review of the record in search of an alleged error. (*McComber v. Wells, supra*, 72 Cal.App.4th at p. 522.)  Thus, we may treat Mother's claim "'as waived, and pass it without consideration.' [Citation.]" (*Id.* at pp. 522-523.)

Even considering Mother's claim on its merits, we reject it.  In July 2016, the court determined ICWA does not apply.  Mother, as the appellant, has the burden of showing the evidence was insufficient to support the ICWA finding.  (*In re D.F.* (2020) 55 Cal.App.5th 558, 565.)  Mother has not carried her burden.  The appellate record shows the Agency spoke with Mother on three occasions in 2015 concerning the children's potential Indian heritage, and at that time, she stated she had Cherokee Indian heritage in her family.  The Agency obtained information from Mother, and based on the information provided by "available family members," the Agency sent notices in January 2016 to the pertinent federal agencies (Secretary of the Interior and Bureau of Indian Affairs) and three Cherokee tribes.  After responses were received, the juvenile court found the Bureau of Indian Affairs and the tribes had been noticed as required, and the court determined in July 2016 that ICWA does not apply.

15

In December 2021, the juvenile court ordered Mother to submit to the Agency any new information relating to ICWA. However, there is no indication in the record Mother did so. Accordingly, we have no reason to reverse the court's finding that ICWA does not apply. If Mother has *new* information concerning the children's Indian status, she should provide it to the Agency and the court as both have a continuing duty to inquire whether the children are or may be Indian children. (§ 224.2, subd. (a).)

## DISPOSITION

The January 5, 2022 order from the section 366.3 postpermanency hearing is affirmed.

MARKS, J.*

WE CONCUR:

GOETHALS, ACTING P. J.

SANCHEZ, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.